**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| CHARLES H. DISE | : | |
| | : | |
| v. | : | CIVIL NO. CCB-07-1893 |
| | : | |
| EXPRESS MARINE, INC. | : | |

...o0o...

## MEMORANDUM

Now pending before the court are cross motions for summary judgment filed by the plaintiff, Charles Dise, and the defendant, Express Marine, Inc. ("EMI"). Dise has sued to recover for injuries he sustained during his employment with EMI as a seaman. EMI has countersued to recover various payments made in connection with the accident that caused the plaintiff's injuries. The issues have been fully briefed and the parties have been heard. For the following reasons, the court will grant the defendant's motion and will grant the plaintiff's motion in part and deny it in part.

## BACKGROUND

Plaintiff Charles Dise was a Maryland resident at the time of the relevant events and employed as an assistant engineer on the Tug BALTIMORE by Defendant EMI. EMI is a New Jersey corporation engaged in the business of towing barges and commodities from various East Coast and Gulf Coast locations. Dise began working for EMI in October 2003.

In April 2005, EMI assigned Dise to work on the Tug BALTIMORE as an assistant engineer. His duties included standing watch in the engine room during specified shifts. During

1

the month of July 2005, the Tug BALTIMORE was assisting with the loading of a barge near

Mobile, Alabama.  Around the time of Dise's assignment to the Tug BALTIMORE, EMI

purchased a fourteen-foot Boston Whaler ("the skiff") for the purpose of taking draft readings on

the barge associated with the Tug BALTIMORE. According to First Mate Doug Covil, prior to

July 19, 2005, the skiff had been used only for taking draft readings.  Since that date, however,

the skiff has also been used to transport groceries and supplies to and from the tug.  (Pl.'s Mot. at

Ex. 4, Covil Dep. at 26.)

On the evening of July 19, 2005, the Tug BALTIMORE and the associated barge were

docked at a terminal on Three Mile Creek.  In addition to Dise, the other members of the crew on

board the Tug BALTIMORE included Captain Michael Daniels, Mate Covil, Chief Engineer

Sammy Edwards, Bargeman Jerry Harper, Assistant Bargeman George Greggs, and the cook,

Otis Foster.  Just before midnight that night, Daniels asked Greggs to take draft readings from

the adjoining barge using the skiff.  Daniels also instructed Greggs to deliver a radio to Harper.

Although Greggs had never operated the skiff prior to that night, both Daniels and Covil had

used the skiff to take barge readings on numerous occasions.  In his deposition, Daniels testified

that he had taken the skiff out earlier that very evening to measure the drafts.  Neither party

testified to experiencing any problems with the skiff.

At the time Daniels ordered Greggs to take the barge readings, Dise was also present in

the galley.  Dise asked Daniels for permission to drive the skiff while Greggs took the draft

readings.  According to the testimony of Daniels, which was corroborated by Covil, Daniels

replied to Dise with something along the lines of, "it d[oes]n't take two people to read drafts."

(Pl.'s Mot. at Ex. 3, Daniels Dep. at 39; *accord id.* at Ex. 4, Covil Dep. at 68.)  After Daniels left

the galley, however, Dise informed Covil that he was planning to accompany Greggs, and Covil did not explicitly tell him not to follow through on that plan.  (Pl.s' Mot. at Ex. 4, Covil Dep. at 73-75.)  Dise and Greggs then met on the deck a few minutes later, boarded the skiff, and drove it to the barge to take the draft readings.  Dise drove the skiff, while Greggs sat toward its bow.

Once the initial draft readings had been acquired, Dise and Greggs decided to take the boat down Three Mile Creek.  Dise testified that it was Greggs's idea to take the skiff down river to see a ship moored nearby (Pl.'s Mot. at Ex. 1, Dise Dep. at 190), while Greggs testified that Dise wanted "to run the boat and see how it operated."  (*Id.* at Ex. 11, Greggs Dep. at 41.)  It is undisputed that Dise was at the helm of the skiff during the entire incident.

Dise steered the skiff down river toward the moored ship, passing under a railroad bridge along the way.  Shortly after passing under the bridge, a call came into the skiff to take a second set of draft readings at the first location because, according to Greggs, Harper had noticed a "discrepancy" and so wanted a new set of readings taken.  (*Id.* at 42.)  According to Dise, he heard the word "emergency" over the call, and he immediately turned the boat upriver and accelerated toward the barge. (Pl.s' Mot. at Ex. 1, Dise Dep. at 198-201.)  In his deposition testimony, Dise claimed the fastest he drove the boat was seventeen or eighteen knots, short of full throttle (*id.* at 201); however, in his diary entry made after that night he described the speed of the skiff as "full speed ahead."  (Def.'s Mot. at Ex. 6, Dise Phone Dep. at 324.)  Greggs also testified that, when Dise turned the boat around, "he opened the boat up full throttle," which Greggs recognized because he could see that the throttle was all the way forward.  (Pl.'s Mot. at Ex. 11, Greggs Dep. at 49.)

Dise claims that when he turned the skiff around he was blinded by lights on the ship

ahead of him and could not clearly see the bridge, so he asked Greggs to shine the skiff's

spotlight, which he had been using to do the draft readings, on the bridge.  (Pl.'s Mot. at Ex. 1,

Dise Dep. at 200.)  When Greggs did not respond, however, Dise did not slow the boat or await

Greggs's compliance; indeed he recalls "spe[eding] up a little bit more" at that point.  (*Id.* at

202.)  Shortly thereafter, Dise and Greggs crashed into one of the bridge's bulkheads and were

thrown into the water, suffering injuries to their extremities.  According to Dise, without the

spotlight shined on the bridge, he could not make out the contours of the bridge.  (*Id.* at 202-03.)

According to Greggs, it was a clear night, he could clearly see the bridge and its bulkheads up

until the moment of impact, and he yelled to Dise to slow down just before the crash.  (Pl.'s Mot.

at Ex. 11, Greggs Dep. at 59-60.)

After the collision, Dise and Greggs managed to hold onto the skiff and get to the shore

of Three Mile Creek.  Once ashore, Dise located a watchman on the railroad bridge who called

911.  An ambulance responded to the scene and took Dise and Greggs to the University of South

Alabama Medical Center ("USA Medical") in Mobile.  Upon learning of the accident, EMI

representative Keith Kirkeide was dispatched to Mobile to oversee Dise's medical care.  EMI

paid for all of the medical expenses Dise incurred while at USA Medical, which included

treatment of a major injury to his left leg.

USA Medical discharged Dise on July 23, 2005, at which point he boarded a flight to

travel back to Baltimore.  In the course of the trip back to Baltimore, Dise became severely ill.

An ambulance was called and transported Dise to St. Agnes Hospital immediately upon his

arrival in Baltimore.  Doctors at St. Agnes Hospital discovered that Dise's leg wound was

infected with a severe bacterial infection requiring an immediate operation and extensive

treatment.  St. Agnes Hospital thus transferred Dise to the University of Maryland Shock Trauma Center the next day for additional treatment.  Over the next two years, Dise underwent multiple surgeries in an attempt to restore function to his leg.  He reached maximum medical improvement on January 31, 2008, though he has permanent injuries to his leg.  Dise did not return to work for EMI after the accident.

Dise filed suit in this court on July 17, 2007, seeking damages under the Jones Act and various maritime doctrines.[1]  On October 12, 2007, EMI counterclaimed, seeking to recover for damages to the skiff and for payments made to Dise for maintenance and cure, as well as indemnification for payments made to settle Greggs's claims.  After discovery was completed, EMI filed a motion for summary judgment on all of Dise's claims.  Dise opposes the motion and has filed a cross-motion for summary judgment regarding his claim for vicarious liability (Count III) and all of EMI's counterclaims.  The court heard oral argument on these motions on August 14, 2009.

## ANALYSIS

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The Supreme Court has clarified

---

[1] Count I of the complaint alleges negligence under the Jones Act, 46 U.S.C. app. § 688; Count II is a claim of unseaworthiness; Count III alleges vicarious liability under the Jones Act for negligent provision of medical care; Count IV seeks maintenance and cure; and Count V seeks unpaid wages.

this does not mean that any factual dispute will defeat the motion. "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original).

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 525 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)). The court must "view the evidence in the light most favorable to . . . the nonmovant, and draw all reasonable inferences in her favor without weighing the evidence or assessing the witness' credibility," *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 645 (4th Cir. 2002), but the court also must abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat*, 346 F.3d at 526 (internal quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993), and citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)).

### A. Count I: Jones Act

The Jones Act provides a cause of action in negligence for "[a]ny seaman who shall suffer personal injury in the course of his employment." 46 U.S.C. app. § 688(a). Through reference, the Jones Act accords seamen the same rights as those given to railway employees under the Federal Employers' Liability Act ("FELA"), 45 U.S.C. § 51 *et seq. Hernandez v.*

*Trawler Miss Vertie Mae*, 187 F.3d 432, 436 (4th Cir. 1999).  FELA provides in relevant part

that railroad employees enjoy a right of recovery for injuries resulting from the negligence of

their employers or their employers' agents or employees.  45 U.S.C. § 51.  To prevail on a Jones

Act claim, a seaman must show: "(1) personal injury in the course of his employment; (2)

negligence by his employer or an officer, agent, or employee of his employer; and (3) causation

to the extent that his employer's negligence was the cause 'in whole or in part' of his injury."

*Hernandez*, 187 F.3d at 436.


     *i. In the Course of Employment*

     As a threshold matter, EMI alleges that Dise was not acting within the course of his

employment under the Jones Act at the time of the accident.  Both parties contest the meaning of

"course of employment," specifically its relationship to the term "in the service of the ship"

associated with maintenance and cure.  *See* Robert Force & Martin J. Norris, The Law of

Seamen § 26:2 (5th ed. 2004).  Dise, relying on dicta in *Braen v. Pfeifer Oil Transp. Co.*, 361

U.S. 129 (1959), suggests that the two standards are equivalent.  *See id.* at 132-33 (noting that

*Aguilar v. Standard Oil Co.*, 318 U.S. 734 (1943) and *Warren v. United States*, 340 U.S. 523

(1951), two cases involving the maintenance and cure claims of seamen on shore leave,

"suppl[ied] relevant guides to the meaning of the term 'course of employment' under the [Jones]

Act since it is the equivalent of the 'service of the ship' formula used in maintenance and cure

cases").  EMI, in contrast, relies on the holding in *Braen* to distinguish the two standards.

*Compare id.* at 133 (holding that the plaintiff, who was not on the ship at the time of the

accident, was still acting "'in the course of his employment' at the time of the injury, for at that

moment he was doing the work of his employer pursuant to his employer's orders") *with Farrell v. United States*, 336 U.S. 511, 515-16 (1949) (defining "in the service of the ship" as being "generally answerable to its call to duty rather than actually in performance of routine tasks or specific orders"); *see also Vella v. Ford Motor Co.*, 421 U.S. 1, 4 (1975) (holding, in a case decided after *Braen*, that a shipowner's maintenance and cure "duty arises irrespective of the absence of shipowner negligence and indeed irrespective of whether the illness or injury is suffered *in the course of the seaman's employment*") (emphasis added) (citing *Calmar S.S. Corp. v. Taylor*, 303 U.S. 525, 527 (1938)).

The court is inclined to agree with other lower courts that have found the "course of employment" standard under the Jones Act requires more than the "in the service of the ship" standard applicable to maintenance and cure. *See, e.g.*, *Colon v. Apex Marine Corp.*, 832 F. Supp. 508, 513-14 (D.R.I. 1993), *aff'd*, 35 F.3d 16 (1st Cir. 1994), *cert. denied*, 514 U.S. 1018 (1995) (holding shipowner not liable for seaman's injuries sustained during a fight while on shore leave because he was pursuing private interests and not performing duties assigned to him, reasoning that the Jones Act standard is more limited than the maintenance and cure standard). Nonetheless, whether Dise was acting within the course of his employment at the time of the collision is a close question. While Dise appears to have been pursuing private interests in taking the skiff down river away from the barge, he was still on duty and was returning to the ship to conduct draft readings at the time of the accident. For purposes of the present analysis, the court will assume without deciding that Dise was acting within the course of his employment at the time the accident occurred.

*ii. Negligence*

Common law principles of negligence apply in the context of the Jones Act: "a plaintiff must establish the breach of a duty to protect against foreseeable risks of harm." *Hernandez*, 187 F.3d at 437. While the Jones Act should not be treated as a worker's compensation statute, its standard of causation has been relaxed such that an employer may be liable "whenever 'employer negligence played any part, even the slightest, in producing the injury or death for which damages are sought.'" *Id.* at 436 (quoting *Consol. Rail Corp. v. Gottshall*, 512 U.S. 532, 543 (1994)). In addition, the doctrine of comparative negligence (and not the absolute bar of contributory negligence) applies. *Id.* Thus, "in establishing a Jones Act claim based on negligence, the elements of duty, breach, and injury draw on common law principles; the element of causation is relaxed; and common law defenses are modified or abolished." *Id.* at 437.

Despite a relaxed causation standard under the Jones Act, a defendant's alleged negligence must have at least some causal relationship to the accident. *See, e.g.*, *Petition of Atlass*, 350 F.2d 592, 600-01 (7th Cir. 1965) (concluding, where seamen who had been drinking while on shore leave drowned as they tried to board the ship, that, despite allegations of insufficient lighting around the boarding location, there was "no basis for a reasonable inference" that it was the cause of the accident; rather, the intoxication and misconduct of the decedents was the sole cause); *Jackson v. Pittsburgh S.S. Co.*, 131 F.2d 668, 669 (6th Cir. 1942) (concluding, where seaman was injured jumping from the deck of the vessel to the dock after coming off of watch duty, that, even if the ship breached a duty to the plaintiff by failing to provide a ladder, the negligence bore no causal relationship to plaintiff's injuries, making

dismissal appropriate).[2]

Here, Dise alleges that EMI failed to maintain a safe working environment in at least four ways, and that these failures were causes of the accident.  He first contends that EMI's failure to train Greggs in small boat handling procedures at night made it necessary for Dise to assist him and contributed to the accident.  Aside from the lack of any evidence that Dise's employer requested him to assist Greggs, or believed any assistance was necessary, it is undisputed that Greggs and Dise had equivalent levels of training in the handling of small boats; both men had an AB license and experience operating Boston Whalers.

Dise also contends that the defendant's failure to have in place written or verbal guidelines with respect to the use of the skiff was a cause of the accident.  Considering that Dise was neither assigned nor given permission to drive the skiff, let alone to drive it at a high rate of speed, he has failed to offer any evidence that the absence of written guidelines regarding the use of the skiff contributed to or caused the accident.  Furthermore, plaintiff makes no allegations that, at the time of the accident, there had been any previous problems with the use of the skiff or that there was an apparent need for written guidelines.

In addition, Dise argues that Greggs's failure to shine the skiff's spotlight in the moments before the collision was negligent and a contributing cause of the accident.  Dise, however, has failed to offer evidence that Greggs breached any duty owing to Dise to shine the spotlight at the time of the accident.  Dise presents no evidence that it was standard practice for a passenger to

---

[2] For a Fourth Circuit ruling on this issue, see *Thompson v. Vane Lines Bunkering*, 15 Fed. Appx. 77 (4th Cir. 2001) (unpublished).  In that case, the Fourth Circuit affirmed a district court's finding that the sole proximate cause of the plaintiff seaman's fall from a rope ladder was his exhaustion and physical inability to hold on to the ladder, despite his claim that the rope had been negligently rigged without handrails or grabrails. *Thompson*, 15 Fed. Appx. at 79-80.

shine a spotlight while riding in a skiff; indeed, it is undisputed that Greggs did not shine the

spotlight for Dise when they first rode under the bridge.  Dise's expert offered merely that

"[w]ith all of his commercial tugboat experience, . . . [Greggs] should have recognized the need

to illuminate the end of the fendering pier."  (Pl.'s Mot. at Ex. 12, Dein Ltr. at 8.)  Greggs

testified, however, that he could clearly see the bridge and the bulkheads during the entire return

trip and that he warned Dise to slow down before the accident.  Also, while Dise claims the

purpose of the spotlight was to assist with navigation, the evidence suggests that the spotlight

was intended purely to assist with the draft readings.  Had Greggs taken the draft readings

himself, as instructed by Daniels, he would not have been able to use the spotlight for navigation

purposes.

        Even assuming Greggs's failure to shine the spotlight was negligent, the plaintiff's

conduct – driving the skiff at a high rate of speed despite claiming that he was unable to see the

bridge and knowing he was in close proximity to the bulkhead[3] – was the sole proximate cause

of the accident.  Although Dise claims he asked Greggs to shine the spotlight on the return trip,

rather than waiting for Greggs to respond, he continued to accelerate the skiff in the direction of

the bulkhead.  Moreover, the defendant claimed in its memoranda and at the August 14 hearing

that the Coast Guard determined the cause of the accident was "excessive speed," and the

plaintiff has not challenged that assertion.  In light of these circumstances, Dise has failed to

raise a genuine issue for trial that Greggs's failure to shine the spotlight was a proximate cause

---

        [3] In his deposition, Dise testified that the skiff had traveled approximately 25 to 30 feet
past the bridge when the call came in for the skiff to return.  (Pl.'s Mot. at Ex. 1, Dise Dep. at
198.)  According to Greggs, the boat was farther from the bridge – 40 to 50 yards.  (*Id.* Ex. 11 at
56-57.)

of the accident.

Finally Dise contends that his "inability . . . to turn the skiff to the left at the crucial last moments was probably a result of [the skiff's] defective steering at high speed, and an additional cause of the allision." (Pl.'s Mem. at 11-12.) Plaintiff relies on expert testimony from a former member of the U.S. Coast Guard Vessel Accident Safety Board, who, upon reviewing the operator's manual and the testimony of the crewmen, concluded that "Mate Covil, who took responsibility for outfitting and breaking in the skiff's engine, did not ensure that the tilt and trim were adjusted properly." (*Id.* at 12.) The expert bases this assessment not on any physical defects observed with respect to the skiff, but rather on Mate Covil's testimony that, prior to the accident, he had not run the boat at full throttle, which would have uncovered any high speed steering problems. (Pl.'s Mot. at Ex. 12, Dein Ltr. at 7.) This opinion, without any corroborating evidence that the tilt and trim function was in fact improperly adjusted, is insufficient to create a genuine issue as to causation. Moreover, it is uncontested that Captain Daniels and Mate Covil had previously operated the skiff for the intended purpose of taking draft readings, and neither one experienced any problems with the operation of the skiff. In short, while Dise claims he was unable to steer the boat adequately, he has failed to present sufficient evidence that his inability was due to EMI's negligent maintenance of the skiff.

As stated in *Hernandez*, "[t]he mere fact that an accident occurs or that injury is sustained does not prove negligence." 187 F.3d at 438 (concluding, in case in which the plaintiff was injured when running to fix an allegedly faulty winch, that there was no evidence of negligence where "all indications were that the winch worked properly on the voyage in question"). Accordingly, because none of the plaintiff's theories of EMI's negligence raises a genuine issue

for trial, and for all of the other reasons above, EMI's motion for summary judgment on the

Jones Act claim in Count I will be granted.

**B. Count II: Unseaworthiness**

Under traditional maritime law, "[a] vessel is in seaworthy condition when it is in a

condition reasonably suitable and fit for the purpose or use for which the vessel is intended."

*Mitola v. Johns Hopkins,* 839 F. Supp. 351, 357 (D. Md. 1993). "To prevail on an

unseaworthiness claim, a plaintiff must show that 'the unseaworthy condition of the vessel was

the proximate or direct and substantial cause of the seaman's injuries.'" *Hernandez*, 187 F.3d  at

439 (quoting *Gosnell v. Sea-Land Serv., Inc.*, 782 F.2d 464, 467 (4th Cir. 1986)). Courts have

long recognized that the "causation burden is more demanding that the one the plaintiff

undertakes under the Jones Act." *Id.* (internal quotations and citation omitted).

To support his unseaworthiness claim, Dise advances arguments similar to those used to

support his Jones Act claim, primarily that deficiencies in the crew and the vessel created an

unseaworthy condition. For the reasons discussed above, these arguments also fail here because

there is no evidence that these alleged conditions, even if they existed, caused Dise's injuries.

Instead, Dise's own negligent handling of the skiff was the sole proximate cause of his injuries.

Moreover, any isolated negligence on the part of Greggs would not render the vessel

unseaworthy, as there is no evidence that Greggs was not performing up to the ordinary

standards of seafaring. *See Mitola*, 839 F. Supp. at 358 ("A condition, transitory or otherwise, of

a crew member (lack of skill, knowledge, etc.) rendering him not fit for his ordinary duties or not

up to the ordinary standards of his profession renders the vessel unseaworthy; an isolated act of

negligence committed by an otherwise competent crew member does not.") (quoting *Hogge v. SS Yorkmar*, 434 F. Supp. 715, 736 (D. Md. 1977)).

Based on the record, Dise has not alleged sufficient facts to support a finding that the vessel was unseaworthy.  As a result, the court will grant EMI's motion for summary judgment on Dise's unseaworthiness claim.


### C. Count III: Vicarious Liability for Negligent Medical Care

Maritime law imposes upon shipowners the duty to provide proper medical treatment to a sick or injured crewman regardless of fault.  *De Zon v. Am. Pres. Lines*, 318 U.S. 660, 667 (1943).  A shipowner can violate this duty to provide "prompt and adequate" medical care in two ways: "directly, such as when the shipowner fails to get a crewman to a doctor when it is reasonably necessary and the ship is reasonably able to do so; and vicariously, when the shipowner selects a doctor who acts negligently." *Olsen v. American S.S. Co.*, 176 F.3d 891, 896 (6th Cir. 1999).  In the present case, Dise alleges only vicarious liability.  The court has already assumed without deciding that Dise sustained his injuries while he was acting within the course of his employment, thus the following analysis focuses on the agency relationship required for vicarious liability under the Jones Act to attach.

The Supreme Court has held that "an accommodating scope must be given to the word 'agents' to give vitality to the standard governing the liability of carriers to their workers injured on the job." *Sinkler v. Missouri Pac. R.R. Co.*, 356 U.S. 326, 330-31 (1958).  Thus, "when a railroad employee's injury is caused in whole or in part by the fault of others performing, under contract, operational activities of his employer, such others are 'agents' of the employer within

14

the meaning of . . . FELA." *Id.* at 331-32.  The same standard applies in the Jones Act context.  *See Fitzgerald v. A. L. Burbank & Co.*, 451 F.2d 670, 680 (2nd Cir. 1971) (applying *Sinkler* in Jones Act case).  Where a ship carries on board a physician employed by the ship, vicarious liability attaches to the shipowner for the physician's negligence.  *See De Zon*, 318 U.S. at 668-69.  In addition, on-shore physicians and hospitals may become agents of an employer within the meaning of the statute, for example, when they perform services under contract with the shipowner.  *See, e.g.*, *Fitzgerald*, 451 F.2d at 680.

Courts have also consistently held that an agency relationship exists when a shipowner engages the services of an on-shore physician.  *See, e.g.*, *Olsen*, 176 F.3d at 895-96 ("[T]he shipowner is liable for the negligence of an on-shore physician that it hires to treat a crewman.") (collecting cases); *Cent. Gulf S.S. Corp. v. Sambula*, 405 F.2d 291, 299 (5th Cir. 1968) (holding shipowner vicariously liable where shipowner's agent brought injured seaman to physician who misdiagnosed and mistreated plaintiff's eye injury).  Liability does not attach, however, when a seaman selects his own physician.  *See Joiner v. Diamond M Drilling Co.*, 688 F.2d 256, 262 n.9 (5th Cir. 1982) ("[W]e can find no case holding a shipowner vicariously liable for the negligence of an onshore physician selected by the injured seaman himself.").  This distinction suggests that, in order to be vicariously liable for the medical malpractice of a treating physician, the shipowner must take some affirmative act in selecting or engaging the physician.  *See Greenwell v. Aztar Indiana Gaming Corporation*, 268 F.3d 486, 489 & 492-93 (7th Cir. 2001) (Posner, J.) (noting that, where the employer merely referred the plaintiff to the allegedly negligent doctors, they "were neither employees of the defendant nor acting on behalf of [defendant], thus eliminating any basis for vicarious liability").

15

There is no evidence in the record that EMI affirmatively engaged USA Medical to treat Dise and Greggs.  Dise argues, however, that EMI constructively selected USA Medical because EMI's written procedure for responding to an accident instructs employees to "call 911 first" in the event of an emergency (Pl.'s Mot. at 28),[4] and those who responded to the watchman's 911 call on Dise's behalf naturally took him to USA Medical, which is the only level-one trauma center in the region.  According to Dise's logic, because it is likely he would have been taken to USA Medical had he been discovered by an EMI employee, EMI should be vicariously liable for USA Medical's alleged negligence.  Speculation about the hospital EMI might have selected, however, is insufficient to raise an issue for trial.  While EMI's policy does indeed instruct employees to call 911 in the case of an emergency, such a general directive does not create an agency relationship between EMI and every trauma center to which an injured seaman could be brought as a result of that call.  Further, Dise has failed to establish that his injuries could be treated only at a level-one trauma center; in its papers, the defendant cites to several other trauma centers in the region and the plaintiff has not disputed their existence.  Moreover, even if USA Medical was the only trauma center equipped to treat Dise's injuries, there is still no evidence that EMI affirmatively engaged its services or the services of the particular physicians who treated Dise.

Dise further contends that, because EMI did not seek to move him to another hospital and because it paid his hospital bills, it established an agency relationship with the treating hospital.  As to the latter contention, EMI was merely fulfilling its duty to provide maintenance and cure.

---

[4] Dise testified at his deposition that he had never reviewed EMI's safety manuals prior to the accident.

As to the former, acquiescing to where a seaman receives medical care is, on its own, insufficient to establish agency. *Cf. Gregory v. Union Pac. R.R. Co.*, 673 F. Supp. 1544, 1548-49 (D. Nev. 1987) (explaining, in the context of FELA, that because the railway did not send the injured employee to a physician acting on the employer's behalf, "the fact that the medical insurance benefits provided to [the railway] employees provides for reimbursement of incurred medical costs cannot be construed as creating an agency relationship between [defendant] and any and all health care providers consulted by [plaintiff], even those which may have been recommended by [the railway]").

While the agency standard is relaxed under the Jones Act, Dise has not offered sufficient evidence to establish an agency relationship between USA Medical and EMI.  Accordingly, the court will grant EMI's motion for summary judgment on the vicarious liability claim and will deny Dise's motion for summary judgment on that claim.

### D. Count IV: Maintenance and Cure

"Maintenance and cure provide a seaman who becomes ill or injured in the service of his ship lodging, board, and medical expenses until he reaches maximum recovery." *Williams v. Kingston Shipping Co., Inc.*, 925 F.2d 721, 723 (4th Cir.1991).  Dise admits in his opposition memorandum that EMI paid his maintenance and cure up through his maximum medical improvement date, with the exception of amounts due to Dr. Glenwood Brooks, a psychiatrist and one of Dise's expert witnesses.  At his deposition in July 2008, Dr. Brooks testified that he was unsure if Dise had been billed for any of his visits, and only after the deposition did he submit a one-page, hand-written invoice addressed to plaintiff's counsel listing his hourly rate

17

and his appointments with Dise – eleven in all, from September 5, 2005 through February 15, 2008. (Def.'s Mot. at Ex. 16, Brooks Dep. at 173-74; *id.* at Ex. 17.) Moreover, a representative of the Walters Nixon Group, the entity hired by EMI to arrange payment of Dise's maintenance and cure, averred in his sworn affidavit that the Walters Nixon Group had paid two invoices for services Dr. Brooks rendered to Dise on September 2 and 3, 2005, and had received no other invoices regarding Dr. Brooks's services. (Def.'s Mot. at Ex. 14, Walters Aff. at 3.)

This evidence suggests that Dise was not personally charged for these visits at the time they occurred and that no invoices were created until after Dr. Brooks's deposition, presumably at the request of counsel[5], raising serious doubts that Dise has incurred any liability that EMI would be required to pay. *See Gosnell*, 782 F.2d at 468 (explaining that, "[i]n order to recover for maintenance and cure, a seaman must offer proof of expenditures made or liability incurred."). Dise has failed to raise a genuine issue for trial that he is entitled to any further maintenance and cure from EMI. Therefore, the court will grant EMI's motion for summary judgment on this count.[6]

### E. EMI's Counterclaims

#### i. Dise's Maintenance and Cure

EMI has filed a counterclaim against Dise seeking to recoup payments made for Dise's maintenance and cure to which EMI now claims he was not entitled. Dise seeks summary

---

[5] Indeed the invoice was addressed to plaintiff's counsel. (Def.'s Mot. at Ex. 17.)

[6] While Dise sued EMI for unpaid wages, he did not oppose EMI's motion for summary judgment on this count, and no evidence in the record supports his claim that EMI failed to pay him all of his wages for the voyage at issue. Accordingly, EMI is entitled to summary judgment on Count V of the complaint as well.

judgment on the counterclaim contending that he was in the service of the ship at the time of the

accident and that his injuries were not caused by his willful misconduct.  The court need not

address the merits of Dise's contentions, however, because EMI is not entitled to recover on

other grounds.

In *Vella*, 421 U.S. at 4-5, the Supreme Court upheld a jury verdict awarding maintenance

and cure despite the fact that the seaman's injury became permanent at the time of the accident.

The diagnosis of permanence was made at a later date, and the jury awarded maintenance and

cure up through the date of the diagnosis.  *Id.*  The Court reasoned that the breadth and

inclusiveness of maintenance and cure assured its easy and ready administration, and so injecting

uncertainty as to when a disability became permanent prior to diagnosis would interfere with the

shipowner's duty.  *Id.* at 4.  The present facts are even less sympathetic to the employer, as EMI

conducted its own investigation after the accident and was privy to the facts regarding whether

Dise was in the service of the ship or was engaging in willful misconduct when it made the

decision to furnish maintenance and cure.  Indeed, EMI made no challenge to its duty to provide

maintenance and cure until the instant case was filed.  Thus, even if EMI's conclusion based on

those facts was erroneous, the court will not now burden the plaintiff with restitution because

EMI wants to challenge that conclusion two years after the fact.  *See Kirk v. Allegheny Towing

Inc.*, 620 F. Supp. 458, 460-61 (W.D. Pa. 1985) (dismissing counterclaim for restitution where

maintenance and cure payments were made unnecessarily based on employer's erroneous

conclusion that the injured employee was a seaman rather than a longshoreman, reasoning that

*Vella* favored burdening the shipowner with the risk of making improper payments of

maintenance and cure under those circumstances).  As Dise rightly points out, if EMI had serious

doubts about its duty to provide maintenance and cure, it could have sought a declaratory judgment after the accident, but it did not do so.  Accordingly, Dise's motion for summary judgment on EMI's counterclaim for recoupment of maintenance and cure will be granted.

### ii. Indemnification for Payments to Greggs

EMI also seeks indemnification from Dise for amounts paid to Greggs in maintenance and cure and to settle his Jones Act claim.  As there is no evidence to support a finding that Dise committed an intentional tort against Greggs, this claim has no merit.  *See California Home Brands, Inc. v. Ferreira*, 871 F.2d 830, 834-35 (9th Cir. 1989) (explaining that, unless a seaman can be held liable for the injuries to his fellow employee, the employer cannot recover against the seaman for indemnification); *Pearson v. Rowan Cos.*, 674 F. Supp. 558, 560-61 (E.D. La. 1987) (holding that a crew member has a cause of action under maritime law against another for an intentional tort but not for general maritime negligence).  Accordingly, the court will grant Dise's motion for summary judgment on this counterclaim.

### iii. Damages to the Skiff

EMI's final counterclaim is for damages to the skiff, in the amount of $3,500. While there is some persuasive authority suggesting EMI's claim may have merit, *see, e.g.*, *Witthart v. Otto Candies, LLC*, 431 F.3d 840, 845 (5th Cir. 2005), EMI may or may not wish to pursue this claim in light of the court's other summary judgment rulings.  EMI should advise the court of its intent to pursue this claim within ten days of the filing of this opinion and accompanying order.

## **CONCLUSION**

For the foregoing reasons, the court will grant the defendant's motion for summary judgment on all of the plaintiff's claims,[7] will deny the plaintiff's motion for summary judgment on his vicarious liability claim and EMI's counterclaim for damages to the skiff, and will grant the plaintiff's motion for summary judgment on EMI's counterclaims for recoupment of maintenance and cure and indemnification for payments to Greggs.

A separate order follows.


   September 4, 2009                              /s/
Date                                     Catherine C. Blake
                                         United States District Judge


---

[7] In light of the court's ruling on EMI's motion for summary judgment, the court will deny as moot the defendant's motion regarding the sufficiency of plaintiff's responses to requests for admissions.